UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JASON BORELLI, | : | |
| Plaintiff, | : | |
| | : | No. 3:18-CV-801 (VLB) |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, *ACTING* | : | September 6, 2019 |
| *COMMISSIONER OF SOCIAL* | : | |
| *SECURITY*, | : | |
| Defendant. | : | |

<u>MEMORANDUM OF DECISION REMANDING THE CASE TO THE COMMISSIONER</u>

Plaintiff Jason Borelli ("Mr. Borelli" or "Plaintiff") challenges the Commissioner of Social Security's final decision to deny his application for disability benefits pursuant to 42 U.S.C. § 405(g). Mr. Borelli moves to reverse or remand the decision, arguing that the Administrative Law Judge ("ALJ") failed to fully develop the record, that Mr. Borelli's claims of pain were insufficiently evaluated, and that the residual functional capacity assessment is unsupported. Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant"), moves to affirm the Commissioner's final decision. For the reasons stated below, the Court DENIES Defendant's motion and GRANTS Plaintiff's motion to remand to allow the ALJ to fully develop the record.

I. <u>Background</u>

Mr. Borelli was born in 1976 and educated up to the 8th grade.[1] [R. 158, 160].[2] He has a history of work in the manual trade. *Id.* Mr. Borelli is married with three children. *Id.* His disability claim is based primarily on chronic lower back pain resulting from herniated discs with impingement of the nerve root. *Id.* at 158, 161.

---

[1] Mr. Borelli testified that he only went through 8th grade, though he could not remember at what age he stopped going to school, *see* [R. 160], and elsewhere in the record Mr. Borelli indicates he may have completed up to 10th grade, *see* [R. 310].

[2] Citations to the record, [Dkt. 15], are identified as [R. __].

## A. Medical Records[3]

Dr. Borelli saw Dr. Xiaoming Hong for primary care treatment from March 2012 to October 2012, with continued appointments after that as well. [R. 408, 413, 417-21]. On March 23, 2012, Mr. Borelli saw Dr. Xiaoming Hong and complained of back pain stemming from a motor vehicle accident seven years prior. [R. 421]. Mr. Borelli reported tenderness and had a positive straight leg raising test, suggesting that a herniated disk may be the cause of the pain. *Id.* Mr. Borelli took Motrin and Percocet for the pain. [R. 418-20]. He also noted a history of mild depression and problems sleeping. *Id.*

In April 2012, Plaintiff reported dental concerns, weight loss, difficulty sleeping, and mild depression. *Id.* Examinations of Plaintiff's extremities and neurological system were unremarkable. [R. 419]. During his next visit, Plaintiff reported that he was moving furniture and had pain in the middle of his back. [R. 417]. Dr. Hong prescribed Robaxin and Mobic. [R. 417]. In September 2012, Plaintiff reported low back pain; he requested Percocet, but did not want to go to pain management. [R. 413]. Dr. Hong referred Plaintiff to a cardiologist, Dr. Nathan Kruger, for dyslipidemia and complaints of chest discomfort. [R. 407].

Plaintiff saw Dr. Kruger on September 14, 2012. [R. 407]. Mr. Borelli complained of shortness of breath, jaw discomfort, severe headaches and episodic dizziness. *Id.* Dr. Kruger observed that Plaintiff walked comfortably and that he was neurologically intact. *Id.* His weight was noted at 305 pounds. Dr. Kruger recommended regular aerobic exercise to lose weight. *Id.*

---

[3] The Commissioner stipulates to the facts included in Plaintiff's Brief, [Dkt. 19-1 at 2-11], and includes supplemental facts, *see* [Dkt. 27-1 at 2-18]. The Court's recitation of the medical history is based on both parties' filings and the record.

Plaintiff saw APRN Julie Dunn of Connecticut Gastroenterology Consultants on October 11, 2012, complaining of a variety of ailments including solid food dysphagia (difficulty swallowing), bloating, and irregular bowel pattern. [R. 404-06]. The physical examination findings were unremarkable. *Id.* APRN Dunn recommended an endoscopy and a colonoscopy following cardiac clearance. *Id.* She also recommended a proton-pump inhibitor (PPI) and Align, but Plaintiff declined medication. *Id.*

Mr. Borelli saw Dr. Steve Levin on November 16, 2012 for pain management evaluation for low back pain. [R. 398-403]. Mr. Borelli reported that his back pain had returned four months ago, noting that surgery was initially recommended but that he had lost weight and his back pain had improved. [R. 398]. Mr. Borelli indicated that his ability to perform activities of daily living, including household chores, shopping and driving, were intact. *Id.* Mr. Borelli's gait was guarded, but he could heel and toe walk, indicating normal muscle strength. [R. 399]. He had full strength through his upper and lower extremities and the straight leg raising tests were negative. *Id.* Dr. Levin noted diagnoses of degenerative disc disease with possible spondylosis, myofascial pain syndrome, sleep disturbance, and gait disturbance. [R. 402]. He referred Mr. Borelli to physical therapy / occupational therapy, and prescribed Baclofen and temporary Oxycodone. *Id.* On January 4, 2013, Plaintiff reported some benefit with pain medication. [R. 453-54].

Mr. Borelli reported to the emergency room at Milford Hospital on January 8, 2013 following a motor vehicle collision, reporting pain primarily in his left trapezius area. [R. 430-31]. Plaintiff reported that he did not take any medications and was prescribed Oxycodone/acetaminophen and Flexeril. *Id.*

On January 30 and in February 2013, Plaintiff reported continued benefit from medication to Dr. Levin. [R. 453]. Mr. Borelli had attended three physical therapy

sessions but did not intend to return due to neck pain.  *Id.*  Mr. Borelli used a transcutaneous electrical nerve stimulation ("TENS") unit during sessions and wanted to use one at home as he had experienced improved symptoms after use.  *Id.*

In March 2013, Mr. Borelli returned to The Orthopaedic Group for the first time in approximately five years and saw Dr. Shirvinda Wijesekera.  [R. 442-45].  On examination, Mr. Borelli's weight was noted at 320 pounds, resulting in a Body Mass Index ("BMI") of 41.1, within the "extreme obesity" range.  *Id.*  Mr. Borelli sat comfortably and was not in any acute distress; his mood and affect were normal.  *Id.*  Examinations of Mr. Borelli's cervical and thoracic spine were unremarkable, but he had tenderness in his lumbar spine.  *Id.*  He had normal sensation, full strength, painless motion, and normal reflexes in his upper and lower extremities and he could toe and heel walk and rise from a seated position.  *Id.*  Dr. Wijesekera prescribed a course of steroids, Medrol Dosepak.  *Id.*  An MRI of Mr. Borelli's lumbar spine showed degenerative disc disease and facet arthropathy in the lumbar spine without central spinal canal stenosis; and left foraminal L3-L4 protrusion and mild facet arthropathy resulting in mild foraminal stenosis, and potential contact with the exiting L3 nerve root.  [R. 447-48].

In March and April 2013, Mr. Borelli reported to Dr. Levin that he was benefitting from pain medication and use of the TENS unit.  [R. 453].

Mr. Borelli had an orthopedic follow-up with physician's assistant ("PA") Sherri O'Connor in April 2013, reporting continued lumbar pain with radiculitis.  [R. 441, 456]. On examination. Mr. Borelli showed a mildly positive straight leg raise on the left side and a mildly antalgic gait, but was otherwise neurologically intact.  [R. 441].  PA O'Connor noted that Mr. Borelli was having significant symptoms causing moderate-to-severe pain and noted her impression was that he had an L3-L4 disc bulge causing L3 radiculitis and

4

L5-S1 disc bulge. PA O'Connor prescribed Mobic and scheduled an epidural injection. *Id.*

Dr. Wijesekera administered a lumbar spine epidural injection in May 2013. [R. 432-34, 446, 450]. Mr. Borelli reported that the injection increased his pain. [R. 423, 425, 427, 440]. Dr. Levin changed Mr. Borelli's medication from Oxycodone to Oxycontin. [R. 452-53]. In June 2013, Mr. Borelli asked Dr. Levin to change his medication back to Oxycodone. Dr. Levin offered him an alternative opioid, which Mr. Borelli declined, saying that if Dr. Levin would not prescribe what he wanted, Dr. Wijesekera would take over his pain medication. [R. 423]. Dr. Levin noted that Mr. Borelli's ability to do chores and ability to engage in daily activities was intact. [R. 424].

On June 28, 2013, Mr. Borelli went to the emergency room with sudden onset back pain. He was diagnosed with a lumbar strain, prescribed Percocet, and sent home. [R. 435-38]. Mr. Borelli saw Dr. Wijesekera on July 10, 2013 and reported that he was not taking pain medication on a regular basis but sometimes took Percocet four times per day. [R. 439]. On examination, Mr. Borelli was alert and oriented with normal appearance and affect. He had some diffuse paraspinal tenderness but his physical examination was otherwise unremarkable. *Id.* Dr. Wijesekera recommended Mr. Borelli resume his pain management and referred him to a neurologist for an EMG. [R. 435-39].

On August 6, 2013, Mr. Borelli went to the emergency room and reported back pain. [R. 464-67, 512-13, 606-08]. He was seen by Dr. Robert Bayer at Yale New Haven. [R. 464-66]. Mr. Borelli said he took Percocet only when he needed it and denied difficult walking, numbness, and weakness. [R. 464]. He had tenderness in his spine, but no spasm, and could sit and stand without difficulty and walked well. [R. 465]. He was given Naproxen and a Lidocaine patch. [R. 512, 608].

On September 9, 2013, Mr. Borelli saw Dr. Wijesekera and complained of pain radiating down his right leg. [R. 648]. An EMG showed no evidence of radiculopathy. *Id.* Dr. Wijesekera recommended pain management but did not recommend surgical intervention. *Id.*

Mr. Borelli saw Dr. Mohan Vodapally on September 11, 2013 for a pain management evaluation. [R. 715-18]. On examination, Mr. Borelli had an antalgic gait, but heel and toe walking were normal. [R. 716-17]. His shoulders and cervical spine were normal and he had 5/5 strength in all major muscle groups, but he had restricted range of motion and tenderness in his lumbosacral spine. *Id.* Lumbar facet loading was positive on both sides. Mr. Borelli's straight leg raising test was negative. *Id.* Dr. Vodapally diagnosed lumbosacral spondylosis with myelopathy, lumbar disc displacement without myelopathy, and obesity. [R. 717]. He prescribed Oxycodone and Zanaflex and recommended diagnostic lumbar facet mapping. [R. 717-18].

On September 24, 2013, Dr. Vodapally noted that the medication somewhat alleviated Mr. Borelli's pain. He performed a bilateral L3, L4, and L5 medial branches of posterior rami block with fluoroscopic guidance. [R. 711-14]. At a follow-up appointment on September 30, Dr. Wijesekera noted unremarkable physical examination findings and that Mr. Borelli was doing better and should continue pain management. [R. 647, 711-12].

Mr. Borelli went to the emergency room on September 30, 2013 complaining of non-radiating chest pain, shortness of breath, recent difficulty word-finding, a sensation "while he was driving he felt as if the car was going to the left," and back pain. [R. 609-10]. His gait and coordination were normal; he had tenderness in his lumbar spine; his attention and memory were intact with normal speech. [R. 476]. Plaintiff had full muscle strength. He was admitted to the hospital for observation and neurological consultation.

His symptoms were thought to be stress-related. [R. 480-82]. All testing was non-diagnostic, and he was released. *Id.*

On October 7, 2013, Dr. Vodapally administered a second set of medial branch blocks, which had significantly relieved Mr. Borelli's pain the first time. [R. 709-10]. The relief from the second set of blocks was marked but temporary. [R. 706-08]. Dr. Vodapally administered a lumbar medial branch radiofrequency ablation ("RFA") at the bilateral lumbar area on November 26, 2013. [R. 703-05].

Dr. Wijesekera saw Mr. Borelli in December 2013. Mr. Borelli reported feeling much better after the RFA but noted an aching tailbone pain. [R. 646] At a December 23, 2013 visit, Mr. Borelli noted a marked increase in pain in the lower sacral area. [R. 645]. Dr. Wijesekera ordered an MRI, which showed no significant changes from the prior MRI. [R. 544-45]. The MRI did show "a left foraminal small disc herniation mildly impinging on the left L3 nerve root[,]" "[m]inimal disc bulging[,]" "similar right foraminal disc protrusion and annular fissure at L4-5 contacting the right L4 nerve root[,]" and "[s]imilar tiny central-right paracentral protrusion at L5-S1 minimally contacting the right S1 nerve root." [R. 544-45].

Mr. Borelli continued primary care visits to Dr. Hong from October 2013 to November 2014. [R. 515-18, 519-21, 524, 553-54, 556-57, 575-77, 583-85, 587-89].

In January 2014, Mr. Borelli saw Dr. Wijesekera and noted lower back pain, which improved with medication and worsened with activity, and denied any new numbness, weakness, or tingling. [R. 644]. Mr. Borelli's physical examination findings were unchanged. *Id.* Dr. Wijesekera noted that the MRI did not demonstrate any surgical pathology and recommended continued conservative care, including physical therapy and pain management. *Id.*

On January 24, 2014, Dr. Vodapally noted that Mr. Borelli had excellent relief of his lower back pain following the RFA site. [R. 781-83]. Mr. Borelli's sacroiliac joint was tender and Dr. Vodapally performed a sacroiliac joint injection on February 11, 2014. [R. 778-79, 783]. Oxycodone and Valium were re-prescribed, and Mr. Borelli reported that his medication was working well. [R. 779]. Dr. Vodapally performed another set of nerve blocks on March 18, 2014, [R. 546-47], and performed a Sacroiliac joint injection on April 8, 2014. [R. 525-27]. Mr. Borelli reported pain in the left gluteal area after his injection. [R. 761-66]. Dr. Vodapally recommended ibuprofen, gave Mr. Borelli samples of Duexis, and replaced Oxycodone with Percocet. [R. 763, 766].

Mr. Borelli's gluteal area pain continued at his April 16, 2014 and May 16, 2014 visits. [R. 761-63, 758-60]. Dr. Vodapally administered a sacroiliac joint injection on June 17, 2014. [R. 756-57].

In December 2014, Mr. Borelli reported that his medication reduced his pain symptoms by 50 percent, but indicated continued low back pain and the development of medication tolerance. [R. 699-701].

Mr. Borelli saw Dr. Hong on January 29, 2015 complaining of back pain and numbness following a fall on ice. [R. 579-581]. An x-ray was unremarkable. [R. 543]. At a follow-up visit on February 4, 2015, Dr. Vodapally recommended another RFA, which took place March 3, 2015. [R. 372, 691-94, 749-50]. Mr. Borelli reported a 50 percent relief of lower back pain following the RFA. [R. 687-90, 746-48]. Dr. Vodapally discontinued Mr. Borelli's Oxymorphone in February 2015 because his drug test was negative for opioids but restarted the Oxymorphone in April 2015. [R. 684-86, 690, 741-45, 751-52].

In May, June, and July 2015, Dr. Vodapally continued Mr. Borelli on Oxymorphone. [R. 673-75, 678-83, 726-28, 732-37]. In July 2015, Dr. Vodapally performed a lumbar medial branch RFA. [R. 693-94].

Dr. Hong's notes from a July 29, 2015 visit, precipitated by forearm pain after slipping, indicate that Mr. Borelli "is unable to move around well. Not capable to perform any type of jobs. He has been applying for Social Security. History of depression. Still feels depressed." [R. 561]. Dr. Hong recommended continued pain management, psychiatry evaluation, and that, due to his depression and pain, that Mr. Borelli not work. *Id.*

Mr. Borelli continued pain management visits to Dr. Vodapally. Dr. Vodapally administered another steroid injection at the L5-S1 level on August 4, 2015. [R. 530-32]. At an August 31, 2015 follow-up appointment, Mr. Borelli indicated that his medication improved his pain symptoms by 50 percent. [R. 721-23].

On September 30, 2015, Mr. Borelli reported increasing low back pain with left leg numbness to Dr. Vodapally. [R. 802-04]. In September and October 2015, Dr. Vodapally noted that Mr. Borelli had improved pain control with RFA of the lumber medial branch and indicated that he would schedule for a repeat procedure. [R. 795-97, 802-04]. Dr. Vodapally added Oxymorphone ER for around-the-clock pain control. [R. 797, 804].

Mr. Borelli went to the Yale New Haven Hospital Emergency Room on September 10, 2016 with chest pain of non-cardiac origin. [R. 81-106]. He returned on October 15, 2016 with chronic low back pain. [R. 59-80]. He was diagnosed with chronic low back pain and with an opioid use disorder. He attended a MAAS program two days later, where he indicated he was dependent on opiates and unable to function without them. [R. 24].

Mr. Borelli reported that the prescribed medication was not enough to deal with his pain. [R. 30].

The November 7, 2016 chart note from MAAS indicates that Mr. Borelli was on prescribed Suboxone, which had a beneficial impact on his pain. [R. 43-45]. The stated short-term goals were to "get stable on [suboxone] and stop using opiates" and "to get back to work." [R. 44].

Mr. Borelli presented to the MAAS program on February 27, 2017 with "depress[ion] and has suicidal ideation and plans, however feels safe today." [R. 51]. He refused an emergency room referral. *Id.* The same occurred when Mr. Borelli was seen at MAAS on March 6, 2017. [R. 52]. Mr. Borelli was seen at Fair Haven Behavioral Health on March 28, 2017 and diagnosed with "severe episode of recurrent major depression, without psychotic features." [R. 17].

### B. State Agency Medical Opinions

State agency medical consultant Dr. Meghana Karande reviewed the record on September 23, 2013. *See* [R. 206]. Dr. Karande's assessment indicates that Mr. Borelli could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds. [R. 205]. It further indicates that Mr. Borelli could stand and/or walk for a total of about six hours and could sit for a total of about six hours in an eight-hour work day. *Id.* He could push and/or pull without limitation. *Id.* He could frequently climb ramps or stairs, balance, kneel, stoop, crouch, and crawl and occasionally climb ladders, ropes, and scaffolds. *Id.* Further, Dr. Karande's assessment indicates that Mr. Borelli has no manipulative, visual, communicative, or environmental limitations. [R. 206].

State agency medical consultant Dr. Firooz Golkar reviewed the record on February 21, 2014. *See* [R. 216]. Dr. Golkar's assessment indicates that Mr. Borelli could

occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds.  [R. 215].  It further indicates that Mr. Borelli could stand and/or walk for a total of about six hours and could sit for a total of about six hours in an eight-hour work day.  *Id.*  He could push and/or pull without limitation.  *Id.*  He could frequently climb ramps or stairs, balance, kneel, and crouch and occasionally climb ladders, ropes, and scaffolds, stoop, and crawl.  [R. 215-16].  Further, Dr. Golkar's assessment indicates that Mr. Borelli has no manipulative, visual, communicative, or environmental limitations.  [R. 216].

### C. Hearing Testimony

#### i. Mr. Borelli's Testimony

Mr. Borelli testified that his disability stems from his back.  [R. 161].  He reported "constant pain, numbness, sharp pain, tingling of the legs, sometimes I get a sharp pain."  *Id.*  He indicated that along with the numbness and tingling in his legs, they cramp up and sometimes give out.  *Id.*  Mr. Borelli explained that he sometimes "walk[s] funny because of the back pain."  [R. 166].

Mr. Borelli testified that he does not carry objects of weight; he does not go grocery shopping, clean the house, or do dishes or laundry.  *Id.*  Beyond reheating food in the microwave, Mr. Borelli testified that he does not cook.  *Id.*  He testified that it is painful to carry a gallon of milk and that he has small bottles for his milk and his water.  [R. 171].

He testified that he gets up at 4:30 am when it is time to take his pain medication.  *Id.* at 167.  He explained that his morning routine, including brushing his teeth and shaving, take place in the bathtub, as it is painful to stand and lean over the sink.  [R. 175].  He later drives his wife to work and his kids to school before returning home, eating, and getting back in bed.  *Id.*  After picking his children up from school, he will sit and lay with them and play video games with them.  *Id.* at 167-68.  He testified that he is "in bed

all hours, that's where [he] mostly spend[s] [his] time[,]" as lying down is the most comfortable position for him. [R. 172]. He explained that the pain worsens the more he moves, and he generally only goes out to drive his wife and kids to work and school and to go to church once or twice a month. [R. 173].

Mr. Borelli testified that sitting is painful and that it is painful to extend his arms out as if to use a keyboard. [R. 170-71]. He sometimes uses the home computer but is only able to do so for approximately 20 minutes. [R. 171]. When Mr. Borelli does stand or sit for some period of time, or does other activities, he said that he would be in bed more the next day to recoup from the pain. [R. 175]. Mr. Borelli explained that the pain medication and nerve ending injections "take[] away a lot of the pain but [] also numb . . . everything." [R. 172].

Mr. Borelli testified that he has not had treatment for depression, though he went to a therapist once but did not find it helpful. [R. 177-79]. He testified that he told the therapist and Dr. Hong that he was depressed, but declined medication for his depression when offered by Dr. Hong. *Id.*

Mr. Borelli testified that while he collected unemployment benefits for a time, he stopped collecting unemployment when he could no longer work. [R. 164-65].

Regarding his past relevant work, Mr. Borelli testified that he worked for an extended period at Carbonella and Desarbo as a warehouse driver, which involved loading and unloading trucks and picking up orders for delivery. [R. 183-84]. This work involved lifting between 30 and 150 pounds and was mostly on his feet to load and pack trucks. [R. 184]. He would drive "big box trucks" to deliver the products he had loaded. *Id.* at 189-90.

Mr. Borelli also previously worked for Security Services of Connecticut for two years, signing people in and out of the building, checking visitors' bags, and doing rounds every hour for about fifteen minutes to make sure doors were locked. *Id.* at 185-86. The job did not involve any heavy lifting. *Id.* at 186. He had the same job duties while working for Securitas and Murphy Security. *Id.* at 186-87, 188.

Mr. Borelli also testified that, as a janitor for Johnson Controls, he cleaned the office building, including waxing and stripping the floors and carpets. He testified that he was on his feet the entire time and had to carry cleaning supplies, move furniture, set up desks and tables for meetings. *Id.* at 187-88. He explained that he did the same kind of work for Gaylord and Three-L. *Id.* at 188.

### ii. Vocational Expert Testimony

The vocational expert, Mr. King, testified as to the skill and exertional level of Mr. Borelli's past work. [R. 191]. Mr. King testified that the janitor / custodian job was classified as medium duty with SCP of 2. *Id.* The security guard position is classified as light duty with an SVP of 3. *Id.* The order picker / warehouse worker is classified as medium duty with an SVP of 2, though as described by Mr. Borelli it would be classified as heavy duty work. *Id.* The truck driver role is classified as medium duty with an SVP of 3. *Id.*

The ALJ then asked Mr. King whether an individual of Mr. Borelli's age, education and past work experience and who is capable of medium work with frequent balancing, kneeling, crouching, climbing ramps and stairs, occasional stooping, crawling, climbing ladders, ropes and scaffolding, and occasional exposure to unprotected heights and dangerous, moving machinery, can perform any of Mr. Borelli's past work. [R. 193-94]. Mr. King explained that such an individual should be able to do the janitor position and

the security position both as described by Mr. Borelli and as customarily performed.  *Id.* at 194.  He also noted that such an individual would be able to perform the truck driver position as described by DOT but not with the lifting described by Mr. Borelli.  *Id.*

The ALJ then asked Mr. King whether, in addition to the conditions in the first hypothetical, that individual would be able to perform any of Mr. Borelli's past work if he would have absences from work two or more days per month on an ongoing basis.  *Id.* at 194-95.  Mr. King testified that, based on his thirty years of experience working with employers and his understanding of what they will and will not tolerate in terms of absences, such an individual would not be able to perform any competitive employment.  *Id.* at 195.

### D.  Evidence Submitted to Appeals Council

Mr. Borelli submitted medical record evidence to the appeals council after the unfavorable decision of the ALJ, including the following information.

Mr. Borelli was treated in the emergency room in September 2016 for unspecified chest pain.  [R. 81-106].  In October 2016, Mr. Borelli went to the emergency room twice for back pain.  [R. 53-80].  At his October 15, 2016 visit to the emergency room, Mr. Borelli was diagnosed with opioid use disorder.  [R. 74-75].  Mr. Borelli began drug dependence treatment later that month at Chemical Abuse Services Agency.  [R. 24-43].  Mr. Borelli reported that he was addicted to pain medications but stated that, in general, his health was good and denied medical conditions other than back pain.  *Id.*  Mr. Borelli was started on Suboxone.  [R. 44-45].

In December 2016, Mr. Borelli reported to a counselor at Chemical Abuse Services Agency that he took care of the house when his wife was at work by cooking dinner,

cleaning, and helping his children with homework and tried to exercise every day despite the pain.  [R. 46].

In January 2017, Mr. Borelli reported that he was struggling with thoughts and emotions but did not want to see a psychiatrist.  [R. 47].  Also in January 2017, Mr. Borelli had a pain management consultation with Dr. Douglas Olson.  [R. 13-14].  Dr. Olson prescribed Buprenorphine-Naloxone and Narcan.  [R. 13].  Mr. Borelli's other medications were Ibuprofen and Tizanidine.  *Id.*  Dr. Olson continued the medications in February 2017.  [R. 15-16].  In March 2017, Mr. Borelli reported depression and suicidal thoughts to his counselor and was prescribed Cymbalta, which was adjusted in April 2017.  [R. 17-21].

### E. ALJ Decision

On July 16, 2013, Mr. Borelli applied for disability insurance benefits under Title II of the Social Security Act, citing an onset of disability date of December 31, 2011 based on chronic back pain and cervical radiculopathy.  [R. 289-90].  His claim was initially denied on June 19, 2014 and on reconsideration on February 3, 2015.  [R. 219-223, 227-229].  He thereafter requested a hearing on April 2, 2014, which was held before Administrative Law Judge ("ALJ") Imelda K. Harrington on January 5, 2016.  [R. 151-189].  ALJ Harrington rendered her opinion on April 27, 2016, denying Mr. Borelli's request for disability insurance benefits.  [R. 114-134].  The Appeals Council denied Mr. Borelli's Request for Review by notice dated August 7, 2017, [R.6-12], making ALJ Harrington's decision the final appealable decision.  ALJ Harrington's conclusions are as follows.

First, the ALJ concluded that Mr. Borelli meets the insured status requirements of the Social Security Act through December 31, 2017.  [R. 119].  The ALJ next concluded that Mr. Borelli had not engaged in substantial gainful activity since December 31, 2011, the alleged onset date.  [R. 120].  The ALJ found that, while Mr. Borelli worked after the

alleged disability onset date, the work activity did not rise to the level of substantial gainful activity. *Id.*

The ALJ found that Mr. Borelli has three severe impairments: lumbosacral spondylosis without myelopathy, sacroiliitis, and obesity. *Id.* The ALJ recognized that there was objective evidence in the record of Mr. Borelli's non-severe impairments, which establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on Mr. Borelli's ability to meet the basic demands of work activity. *Id.* Those non-severe impairments include dysphagia, gastrointestinal reflux disease ("GERD"), sinusitis, toothache, otitis, inclusion cyst on fingers and laceration to the left arm. *Id.*

The ALJ further found that Mr. Borelli's medically determinable mental impairment of depressive disorder does not cause more than minimal limitation in his ability to perform basic mental work activities and is therefore also non-severe. [R. 121]. In coming to this conclusion, the ALJ considered the four broad functional areas (activities of daily living; social functioning; concentration, persistence or pace; and extended episodes of decompensation), the "paragraph B" criteria, *see* CFR, Part 404, Subpart B, App'x 1, and found the following: Mr. Borelli's activities of daily living have no limitation; Mr. Borelli's social functioning has mild limitation; Mr. Borelli's concentration, persistence, or pace have mild limitation; Mr. Borelli has experienced no episodes of decompensation which have been of extended duration. [R. 121].

The ALJ found that the record indicated that Mr. Borelli reported or exhibited signs and symptoms that never culminated in a specific diagnosis sufficient to establish a medically determinable impairment, including cerebral vascular accident ("CVA"), transient ischemic attach ("TIA"), and irritable bowel syndrome ("IBS"). [R. 122].

The ALJ next found that Mr. Borelli does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). [R. 122]. The ALJ found that Mr. Borelli has the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR 404.1567(c), except he can perform frequent balancing, kneeling, crouching, and climbing ramps and stairs with occasional stooping, crawling, and climbing ladders, ropes, or scaffolds. [R. 123]. The ALJ also found that Mr. Borelli may have occasional exposure to unprotected heights and dangerous moving machinery. *Id.*

Finally, the ALJ found that Mr. Borelli is capable of performing past relevant work as a janitor and security guard. [R. 127]. The documented vocational background established that Mr. Borelli had worked as a janitor/custodian, security guard, order picker, and truck driver within the last fifteen years. [R. 127-28]. The ALJ relied on the testimony of a vocational expert who testified that an individual of Mr. Borelli's RFC would be able to perform Mr. Borelli's past relevant work of a janitor and a security guard, as actually and generally performed in the regional and national economy. [R. 128].

Because the ALJ found that Mr. Borelli retains the capacity to perform his past relevant work, the ALJ concluded that Mr. Borelli failed to meet his burden of proof and that Mr. Borelli has not been under disability, as defined in the Social Security Act, from December 31, 2011, through the date of the decision. [R. 128-29].

This appeal ensued on May 10, 2018 and was fully briefed on December 14, 2018.

II. Discussion

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and

were based on a correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

To be "disabled" under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has promulgated the following five-step sequential evaluation process to evaluate disability claims:

1.   First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2.   If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3.   If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5. Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520). If the claim fils on any step, the inquiry is over and the claim is denied. 20 C.F.R. § 404.1520

A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[4] SSR 96–8p, 1996 WL 374184, at *2. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continued basis") (quoting SSR 96–8p, 1996 WL 374184, at *1). RFC is "an assessment based upon all of the relevant evidence . . . [which evaluates

---

[4] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

a claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).[5]

Here, Mr. Borelli argues that ALJ Harrington failed to develop the record and further challenges ALJ Harrington's consideration of his subjective claims of pain and her conclusion regarding his RFC.

### A. Duty to Develop the Record

Mr. Borelli argues that the ALJ failed to satisfy her duty to develop the record because there are no treating physician/clinician opinions on the function-by-function impact of Mr. Borelli's severe impairments in the record. [Dkt. 19-1 at 14-15]. Specifically, Mr. Borelli suggests that the ALJ should have sought assessments from Dr. Vodapally, Mr. Borelli's pain management physician, Dr. Wijesekera, his orthopedist, and Dr. Hong, his long-time primary care physician. *Id.* at 15-16.

Whether the ALJ has met her duty to develop the record is a threshold question. Before determining whether the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). Where the ALJ failed to develop the administrative record, remand for a new hearing is appropriate. *See Rosa v. Callahan*, 168 F.3d 72, 80-81, 83 (2d Cir. 1999).

---

[5] An ALJ must consider both a claimant's severe impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. § 416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

The hearing on disability benefits is a non-adversarial proceeding and the ALJ therefore has an affirmative obligation to develop the administrative record. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The regulations describe this duty, stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). They further state that "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e).

The duty to develop the record exists even when the claimant is represented at the hearing stage. *Perez*, 77 F.3d at 47. Thus, where there are deficiencies in the record, the ALJ is under an affirmative obligation to develop the claimant's medical history. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). On the other hand, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Id.* at 79 n.5. Put another way, the duty to develop the record does not transform the ALJ into an advocate for the claimant obliging the ALJ to seek out evidence to support a claim where no gap exists.

The claimant contends the record is incomplete and bears a burden of establishing first that the record is incomplete and second that the missing evidence is significant. *Santiago v. Astrue*, No. 3:10 CV 937 (TPS)(CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996)); *see also Parker v.*

*Colvin*, No. 3:13-cv-1398 (CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015). He must show that the specific failure constitutes harmful error. *Id.*

"The ALJ's duty to assist a claimant in obtaining her medical records 'carries particular importance' in light of the well-established 'treating physician rule,' which requires the ALJ to grant controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and not inconsistent with other substantial evidence." *Pabon v. Barhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 528 (S.D.N.Y. 1999)). However, the Second Circuit has considered the impact of the absence of opinion evidence and concluded that "remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec'y*, 521 F. App'x 29, 34 (2d Cir. 2013). If the medical records themselves shed sufficient light on a claimant's ability or inability to perform work, a medical source statement or formal medical opinion is not necessarily required. *Monroe v. Comm'r of Soc. Sec'y*, 676 F. App'x 5, 8 (2d Cir. 2017); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (remanding because the medical records "offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). Thus, "remand for failure to develop the record is situational and depends on the 'circumstances of the particular case, the comprehensiveness of the administrative records, and . . . whether an ALJ could reach an informed decision based on the record.'" *Holt v. Colvin*, No. 3:16-CV-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (quoting *Sanchez v. Colvin*, No. 13 Civ. 6303, 2015 WL 736102, at *5-6 (S.D.N.Y. Feb. 20, 2015)).

Here, Mr. Borelli argues that the ALJ's RFC does not reflect his actual limitations because it was crafted without opinions of treating physicians Vodapally, Wijesekera, or Hong. [Dkt. 19-1 at 23]. The Commissioner contends that the ALJ sufficiently developed the record and appropriately relied on the opinions of the state agency medical consultants who reviewed the record—Drs. Golkar and Karande—along with the medical treatment records in determining Mr. Borelli's RFC. [Dkt. 27-1 at 20-26].

Mr. Borelli had three long-standing treating physicians—Dr. Hong, Dr. Wijeskera, and Dr. Vodapally. The record includes visit notes and treatment reports from each of these doctors. However, the notes and reports do not include function impact assessments which would have enlightened the ALJ's RFC determination.

Mr. Borelli's primary care physician, Dr. Hong, treated Mr. Borelli from at least 2012 through 2015. In the visit notes, Dr. Hong consistently indicates that Mr. Borelli has ongoing obesity and back pain, sometimes recommending diet and exercise, but otherwise making no comment as to Mr. Borelli's physical functioning. *See* [R. 555-89]. Dr. Hong does, on one occasion, note that he recommended Mr. Borelli not work "due to his depression and pain." [R. 561]. The ALJ assigned the statement no weight because "it is conclusory, and unsupported by the treatment notes showing the effectiveness of the claimant's conservative treatment for his back condition along with normal mental status examinations with no mental health treatment[.]" [R. 127]. Dr. Hong's treatment notes do not reference Mr. Borelli's functional capacity or limitations.

His orthopedist, Dr. Wijeskera, also consistently documents Mr. Borelli's lower back pain and sometimes notes that the pain worsens with activity, but otherwise does not provide any evaluations or observations regarding Mr. Borelli's functional capacity. [R. 439-60, 644-51].

His pain specialist, Dr. Vodapally, notes Mr. Borelli's complaints of lower back pain, characterized as "constant, dull, throbbing, and intermittent sharp pain with activity." [R. 673, 674-701]. On multiple occasions, Dr. Vodapally indicates that Mr. Borelli reported that his pain does not significantly affect his basic activities of daily living, such as bathing, dressing, eating, etc., but that it does significantly affect the instrumental activities of daily living, such as shopping and using transportation. *Id.* Dr. Vodapally administers injections and radio frequency ablations and prescribes medication, which he notes Mr. Borelli reports improve his pain by fifty percent. *Id.* Dr. Vodapally's visit notes, however, are devoid of any kind of assessment or opinion regarding the impact of Mr. Borelli's pain on his functioning.

As the ALJ notes in her decision, on multiple occasions, Mr. Borelli's doctors recommend he exercise to lose weight. [R. 407, 589, 594]. These recommendations suggest the claimant is not only capable of but would benefit from some degree of exertional activity, however the amount is unspecified. The fact that his treating physicians considered the need for Mr. Borelli to engage in physical activity suggests they would have an opinion on the type and intensity of the physical activity in which he could engage. .

Mr. Borelli also saw Dr. Levin in 2012 and 2013 for pain management. Dr. Levin's visit notes indicate that Mr. Borelli reported that his ability to do chores and other activities of daily living were intact. [R. 398, 424]. These notes are helpful indicators of Mr. Borelli's own reported functional capacity, but still do not relay the treating physician's opinion as to Mr. Borelli's physical limitations.

The ALJ did have, and considered, the evaluations of the consulting physicians. See [R. 126-27]. However, these physicians reviewed the medical record—in Dr.

Karande's case, only the records up to September 2013, and in Dr. Golkar's case, only up to February 2014—and did not evaluate Mr. Borelli in person at any time. They did not have the benefit and insight that comes from having treated a patient in person or over a period of time. Rather, they had only what the record reflected. The record in this case, without treating physician opinions or evaluations, does not provide a sufficient basis from which to determine Mr. Borelli's residual functional capacity.

The Court can understand why the ALJ thought that opinions from the treating physicians would not be of use based on the record before her, including diagnostic tests indicating that Mr. Borelli's physical condition did not account for the severity of his claims of pain, *see* [R. 644-45]. However, the ALJ lacked any kind of opinion or evaluation of how Mr. Borelli's conditions impact his ability to function from the doctors who treated Mr. Borelli. For this reason, the Court remands this case for further development of the record.

### B. Claims of Pain

Mr. Borelli also argues that the ALJ did not give sufficient weight to his claims of pain. [Dkt. 19-1 at 23]. The Commissioner contends that the ALJ appropriately considered Mr. Borelli's subjective statements in determining his RFC. [R. 27-1 at 27]. The Court will proceed to consider this issue despite the necessary remand in order to emphasize the ALJ's discretion to evaluate a claimant's subjective claims of pain and the ALJ's proper exercise of that discretion in coming to her RFC determination in this case.[6]

Social Security Administration regulations provide that, "[i]n evaluating the intensity and persistence of your symptoms, including pain, [the Secretary] will consider

---

[6] This is not to say that the ALJ's evaluation of the credibility of Mr. Borelli's claims of pain may not be impacted by any treating physician opinions the ALJ is able to procure on remand.

all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. [The Secretary] will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." 20 C.F.R. § 404.1529(a). They further provide that "[y]our symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* § 404.1529(c)(4).

The Second Circuit has made clear that "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Succinctly put, "If pain is real to the patient and as such results in that person being physically unable to engage in any gainful occupations suited to his training and experience, and this results from any medically determinable physical or mental impairment, the disability entitles the person to the statutory benefits even though the cause of such pain cannot be demonstrated by objective clinical and laboratory findings." *Id.* at 27 n.3 (internal quotation marks omitted) (quoting *Page v. Celebrezze*, 311 F.2d 757, 762-63 (5th Cir. 1963)). However, "the Secretary is not obliged to accept without question the credibility of [] subjective evidence" of a claimant's pain. *Id.* at 27. "The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.* Where there is conflicting evidence about a claimant's

pain, the ALJ must make credibility findings. *Donato v. Sec'y of HHS*, 721 F.2d 414, 418-19 (2d Cir. 1983). The ALJ is in the best position to decide issues of credibility. *Kirkland v. RR Retirement Bd.*, 706 F.2d 99, 103-04 (2d Cir. 1983).

"[I]f the ALJ after weighing the objective medical evidence in the record, appellant's demeanor, and other indicia of credibility had decided to discredit appellant's claims of severe, disabling pain, then the decision would be supported by substantial evidence and [would be affirmed]." *Marcus*, 615 F.2d at 27. "If, on the other hand, the ALJ in fact did not consider the credibility of appellant's claims of disabling pain, but instead rejected her claims on the ground that objective, clinical findings could not establish a cause for such intense pain, then . . . the Secretary's decision was premised on an erroneous legal standard." *Id.*

The ALJ's decision thoroughly recounts Mr. Borelli's testimony regarding his pain and the ways in which it impacts his functioning. *See* [R. 123-24]; *see also supra* at Section I.C.i. The ALJ then states:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . .

[R. 124]. The ALJ then proceeds to lay out how Mr. Borelli's testimony is inconsistent with the medical records and other reasons why she discounts his subjective claims of pain. *See id.* at 124-26.

The ALJ highlights the medical evidence of L3-L4 disc bulge potentially contacting the L3 nerve root with noted L5-S1 paracentral annular tear and diffuse minimal disc bulge, but also that Mr. Borelli was neurologically intact with no reported issues regarding lower extremity strength, sensation, or reflexes. *Id.* The ALJ acknowledged that Mr.

27

Borelli regularly sought treatment with his primary care provider, his orthopedist, a pain specialist, and via emergency room visits on multiple occasions, but noted multiple reports that Mr. Borelli's pain improved with weight loss, medication, and injection therapy. *Id.* at 124-25. The ALJ relied on the fact that Mr. Borelli had, at times, taken his pain medication inconsistently, and declined to change or increase his medication. *Id.* at 125. In addition, she considers Dr. Wijeskera's conclusion that Mr. Borelli's MRI did not account for his reported level of pain and Dr. Wijeskera's recommendation of conservative treatment rather than any surgical pathology. *Id.*; *see* [R. 644-45].

Further, the ALJ highlighted that Mr. Borelli reported driving his wife to work and children to school, attending church, and working after the alleged onset date, though that work did not constitute disqualifying substantial gainful activity. *Id.* The ALJ noted the lack of any treatment records recommending functional restrictions due to the pain or the underlying condition. *Id.* at 125-26. Instead, Drs. Kruger, Chang, and Hong encouraged exercise and diet in order to lose weight to improve Mr. Borelli's pain, suggesting both that the pain was not completely debilitating, and that Mr. Borelli could alleviate its severity to a certain extent by physical exertion. *Id.* at 407, 589, 594]. The Court notes that, "[o]f course, a remediable impairment is not disabling." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983). (noting that the claimant failed to heed his physicians' recommendations to lose weight, as his obesity aggravated all of his symptoms). Even further, "disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Id.*

"The severity of pain is a subjective measure—difficult to prove, yet equally difficult to disprove. [The court] must not constrain the Secretary's ability to evaluate the

credibility of subjective complaints of pain[.]" *Id.* The ALJ has discretion to "arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant." *Marcus*, 615 F.2d at 27. That is exactly what the ALJ did in this case. She had the opportunity to observe the claimant and assess his mobility and demeanor. Her decision to discount Mr. Borelli's testimony as to the severity of his pain and his self-reported limited daily activities to the extent she did is supported by substantial evidence in the record.

### C. Residual Functional Capacity Assessment

The ALJ found that Mr. Borelli has the RFC "to perform medium work as defined in 20 CFR 404.1567(c) except he can perform frequent balancing, kneeling, crouching and climbing ramps and stairs with occasional stooping, crawling, and climbing ladders, ropes, or scaffolds [and] may have occasional exposure to unprotected heights and dangerous moving machinery." [R. 123]. Mr. Borelli argues that the ALJ's RFC determination is unsupported. [Dkt. 19-1 at 29]. He contends that an obese, and sometimes morbidly obese, individual could not climb ropes for up to one third of a work-day, nor could an individual who has presented with an antalgic gait and history of ankle surgery walk without limitation and climb ramps and stairs for up to two thirds of a work-day. *Id.* at 30. He further contends that the ALJ's accompanying conclusion that he would be able to work as a janitor/custodian or security guard is unsupported, because even the light level of exertion required for the security guard position would require Mr. Borelli to be on his feet 100% of the work-day.[7] *Id.*

---

[7] Under 20 C.F.R. § 404.1567(b), light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing

The ALJ will reevaluate Mr. Borelli's RFC after fully developing the record negating the need for the court to consider the veracity of these claims.

<u>Conclusion</u>

For the aforementioned reasons, the Court DENIES Defendant's Motion to Affirm the Decision of the Commissioner, [Dkt. 27], and GRANTS Plaintiff's Motion to Remand, [Dkt. 19], in order to allow the ALJ to develop the record as discussed *supra* at Section II.A. and reassess her findings based on the fully developed record.  The Clerk is directed to close this case.


**IT IS SO ORDERED**

*Vanessa Lynne Bryant*  Vanessa Bryant
                        2019.09.06 15:21:52 -04'00'
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: September 6, 2019**

---

and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."